556 So.2d 393 (1990)
The SHELBY MUTUAL INSURANCE COMPANY OF SHELBY, OHIO, Petitioner,
v.
Mary Lou Smith, Respondent.
No. 72870.
Supreme Court of Florida.
January 11, 1990.
Rehearing Denied February 27, 1990.
G. Bart Billbrough of Walton, Lantaff, Schroeder and Carson, Miami, for petitioner.
Walter C. Jones, IV of Kocha & Jones, P.A., West Palm Beach, and Philip M. Burlington of Edna L. Caruso, P.A., West Palm Beach, for respondent.
Bonita L. Kneeland of Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, amicus curiae for Florida Ass'n for Ins. Review.
George A. Vaka of Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, amicus curiae for the Florida Defense Lawyers Ass'n.
GRIMES, Justice.
We have for review Shelby Mutual Insurance Co. v. Smith, 527 So.2d 830 (Fla. 4th DCA 1988), based upon conflict with United States Fidelity & Guaranty Co. v. Woolard, 523 So.2d 798 (Fla. 1st DCA 1988). We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
Smith's complaint alleged that in March of 1985 she was injured in an automobile accident caused solely by the fault of the other driver and that the tortfeasor's automobile liability insurer paid her $50,000, the full limits of its policy. Smith asserted that she had a policy with Shelby Mutual that provided for $25,000 uninsured motorist (UM) coverage and that Shelby Mutual nevertheless denied coverage even though her damages exceeded the limits of the tortfeasor's liability coverage. In its answer and counterclaim for declaratory relief, Shelby Mutual claimed that Smith's accident did not involve an "uninsured motor vehicle," as statutorily defined. Upon undisputed facts, the trial court entered final summary judgment in favor of Smith, determining that she was entitled to $25,000 coverage under her policy. The Fourth District Court of Appeal affirmed, recognizing conflict with Woolard, in which the First District Court of Appeal had held that a similarly situated vehicle was not an uninsured motor vehicle under the statute.
Originally, UM coverage came into play only when the offending owner or operator carried no liability insurance whatsoever. § 627.0851, Fla. Stat. (1961). However, subsection 627.727(3)(b), which defines "uninsured motor vehicle" as applied to insured vehicles, was implemented in 1973 (as subsection 627.727(2)(b)) and has remained *394 essentially unchanged. See ch. 73-180, § 4, Laws of Fla. The subsection provides:
(3) For the purpose of this coverage, the term "uninsured motor vehicle" shall, subject to the terms and conditions of such coverage, be deemed to include an insured motor vehicle when the liability insurer thereof:
... .
(b) Has provided limits of bodily injury liability for its insured which are less than the limits applicable to the injured person provided under uninsured motorist's coverage applicable to the injured person.
§ 627.727(3)(b), Fla. Stat. (1985).
Subsection 627.727(1), which defines UM coverage, was amended in 1979 to provide:
The coverage provided under this section shall be over and above, but shall not duplicate the benefits available to an insured under, any workers' compensation law, personal injury protection benefits, disability benefits law, or any similar law; under automobile medical expense coverages; or from the owner or operator of the uninsured motor vehicle or any other person or organization jointly or severally liable together with such owner or operator for the accident. Only the underinsured motorist's automobile liability insurance shall be set off against underinsured motorist coverage.
§ 627.727(1), Fla. Stat. (1979).
In 1982, subsection (2)(b) was added:
In addition, the insurer shall make available, at the written request of the insured, excess underinsured motor vehicle coverage, providing coverage for an insured motor vehicle when the other person's liability insurer has provided limits of bodily injury liability for its insured which are less than the damages of the injured person purchasing such excess underinsured motor vehicle coverage. Such excess coverage shall provide the same coverage as the uninsured motor vehicle coverage provided in subsection (1), except that the excess coverage shall also be over and above, but shall not duplicate, the benefits available under the other person's liability coverage. The amount of such excess coverage shall not be reduced by a setoff against any coverage, including liability insurance. An insurer shall not provide both uninsured motor vehicle coverage and excess underinsured motor vehicle coverage in the same policy.
§ 627.727(2)(b), Fla. Stat. (1983). Subsection (2)(b) was then deleted in 1984 and subsection (1) amended to read:
The coverage described under this section shall be over and above, but shall not duplicate, the benefits available to an insured under any workers' compensation law, personal injury protection benefits, disability benefits law, or similar law; under any automobile medical expense coverage; under any motor vehicle liability insurance coverage; or from the owner or operator of the uninsured motor vehicle or any other person or organization jointly or severally liable together with such owner or operator for the accident; and such coverage shall cover the difference, if any, between the sum of such benefits and the damages sustained, up to the maximum amount of such coverage provided under this section. The amount of coverage available under this section shall not be reduced by a setoff against any coverage, including liability insurance.
§ 627.727(1), Fla. Stat. (Supp. 1984).
Shelby Mutual contends that the 1984 version of the statute is clear on its face and that no inquiry into legislative intent is necessary to determine the purpose of subsection 627.727(3)(b) under the 1984 amendment. It asserts that the subsection provides a threshold definition of uninsured motor vehicle that must be met before the provisions in subsection 627.727(1) can be given effect. Under its interpretation, UM coverage is stacked upon the tortfeasor's liability coverage, but only where UM limits exceed liability limits; otherwise, no UM coverage exists. This view has been approved by the district courts of appeal in Marquez v. Prudential Property & Casualty Insurance Co., 534 So.2d 918 (Fla. 3d DCA 1988), and Woolard. Smith, on the *395 other hand, contends that the legislative history surrounding the 1984 amendment shows that the definition contained in subsection 627.727(3)(b) was not meant to be a threshold requirement. Under her scenario, UM coverage is stacked upon the tortfeasor's liability coverage regardless of the amount of the UM limits.
In resolving the issue in favor of Smith, the court below stated:
Prior to the 1984 amendments, section 627.727(1) allowed for the setoff of a tortfeasor's liability coverage against the injured party's underinsured motorist coverage; and section 627.727(2) required insurers to make available excess underinsured motorist coverage against which liability coverage could not be set off. The Florida Legislature's 1984 amendments barred the setoff of liability coverage and eliminated the provision for excess underinsured motorist coverage. The amendment was made applicable to new and renewal policies with an effective date of October 1, 1984, or later. The Florida Legislature, however, did not amend section 627.727(3)  the language of which has been set forth above. The failure to amend subsection (3) has created confusion about the Legislature's intentions as to the extent and scope of this coverage... .
... .
We conclude that the Legislature intended the 1984 amendment to section 627.727, Florida Statutes, to provide that all uninsured/underinsured motorist coverage be excess coverage and that it pay over and above the tortfeasor's liability coverage should said liability coverage be inadequate to fully compensate the injured insured.
Shelby Mut. Ins. Co., 527 So.2d at 832-33, 835. Accord Morrison v. Universal Underwriters Ins. Co., 543 So.2d 425 (Fla. 5th DCA 1989).
The district court of appeal supported its conclusion by reference to a legislative staff analysis concerning the enactment of the 1984 amendment. Following the 1982 amendment, insurers were required to provide traditional UM coverage and also excess and underinsured motor vehicle coverage. According to the legislative staff analyses of both the Senate and the House of Representatives, the 1984 amendment was designed to combine these coverages into a single form of UM coverage which would be excess underinsured motorist coverage. From examples given within the text of these analyses, it is clear that the authors intended that the 1984 amendment would create the result urged by Smith in this case.
However, we believe the court below misconstrued the language of the statute itself, thereby rendering superfluous what the legislative staffs may have intended. The plain meaning of statutory language is the first consideration of statutory construction. St. Petersburg Bank & Trust Co. v. Hamm, 414 So.2d 1071 (Fla. 1982). Only when a statute is of doubtful meaning should matters extrinsic to the statute be considered in construing the language employed by the legislature. Florida State Racing Comm'n v. McLaughlin, 102 So.2d 574 (Fla. 1958). Courts may look to legislative history only to resolve ambiguity in a statute. Department of Legal Affairs v. Sanford-Orlando Kennel Club, Inc., 434 So.2d 879 (Fla. 1983). As we said in Heredia v. Allstate Insurance Co., 358 So.2d 1353, 1354-55 (Fla. 1978):
In matters requiring statutory construction, courts always seek to effectuate legislative intent. Where the words selected by the Legislature are clear and unambiguous, however, judicial interpretation is not appropriate to displace the expressed intent. Foley v. State ex rel. Gordon, 50 So.2d 179, 184 (Fla. 1951); Platt v. Lanier, 127 So.2d 912, 913 (Fla. 2d DCA 1961). It is neither the function nor prerogative of the courts to speculate on constructions more or less reasonable, when the language itself conveys an unequivocal meaning.
At all times pertinent to our consideration, the introductory sentence to subsection 627.727(1) has read as follows:
No motor vehicle liability insurance policy shall be delivered or issued for delivery in this state with respect to any *396 specifically insured or identified motor vehicle registered or principally garaged in this state unless uninsured motor vehicle coverage is provided therein or supplemental thereto for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom.
(Emphasis added.) An uninsured motor vehicle is defined in subsection (3)(b) as one having limits of bodily injury liability for its insured which are less than the applicable UM limits. Unless there is an uninsured motor vehicle, there can be no UM coverage. Under these circumstances, there is no occasion to resort to the language of subsection (1) prohibiting the setoff of liability insurance because this only comes into play when the limits of the UM coverage exceed the liability limits.
The 1984 amendment deleted all reference to excess underinsured motorist coverage and did not eliminate subsection (3)(b). As written, there is no conflict between subsections (1) and (3)(b). Subsection (3)(b) spells out the circumstances under which there can be UM coverage. In the event such coverage exists, the provisions of subsection (1) explain that the amount of liability insurance cannot be offset against the UM coverage. Thus, under subsection (1), if Smith had UM coverage of $50,000 and the tortfeasor's liability coverage was $25,000, she would be entitled to recover for her damages up to a total of $75,000. Here, however, because the tortfeasor's $50,000 liability coverage exceeded Smith's $25,000 UM coverage, there was simply no uninsured motor vehicle upon which to predicate a claim for UM coverage.[1] Because subsections (1) and (3)(b) can be harmonized, there is no ambiguity on the face of the statute.[2]
We approve the decisions in Woolard and Marquez, disapprove the decision in Morrison, and quash the decision below.
It is so ordered.
EHRLICH, C.J., and OVERTON and McDONALD, JJ., concur.
SHAW, J., dissents with an opinion, in which KOGAN, J., concurs.
BARKETT, J., did not participate in this case.
SHAW, Justice, dissenting.
In my opinion, the following language in subsection 627.727(1), Florida Statutes (1985), is ambiguous when read in conjunction with subsection 627.727(3)(b), Florida Statutes (1985):
[S]uch [UM] coverage shall cover the difference, if any, between the sum of such [liability insurance] benefits and the damages sustained, up to the maximum amount of such coverage provided under this section. The amount of coverage available under this section shall not be reduced by a setoff against any coverage, including liability insurance.
This ambiguity was pointed out by the district court below:
The failure to amend subsection (3) has created confusion about the Legislature's intentions as to the extent and scope of this coverage. This confusion is exemplified by the conflicting positions taken by contributing authors in The Florida Bar's Continuing Legal Education publication on Florida automobile insurance law.
Shelby Mut. Ins. Co. v. Smith, 527 So.2d 830, 833 (Fla. 4th DCA 1988). It has been the subject of commentary by educators within the industry:

*397 In amending F.S. 627.727(1) and (2) without revising 627.727(3), the legislature created an ambiguity with respect to excess uninsured motorist coverage.
L. Rosenbloum, Uninsured Motorist Coverage, in Florida Auto. Ins. Law 53, 75 (The Florida Bar Continuing Legal Education 1985). And it is evidenced by conflicting readings given the statute by the district courts. See Morrison v. Universal Underwriters Ins. Co., 543 So.2d 425 (Fla. 5th DCA 1989) (stacking approved where UM limits do not exceed liability limits); Marquez v. Prudential Property & Casualty Ins. Co., 534 So.2d 918 (Fla. 3d DCA 1988) (such stacking disapproved); Shelby Mut. Ins. Co. v. Smith, 527 So.2d 830 (Fla. 4th DCA 1988) (such stacking approved); United States Fidelity & Guar. Co. v. Woolard, 523 So.2d 798 (Fla. 1st DCA 1988) (such stacking disapproved).
Although a literal reading of the statute could yield the result urged by Shelby, I find this issue controlled by Griffis v. State, 356 So.2d 297, 299 (Fla. 1978), wherein the Court ruled that:
In construing a statute, this Court is committed to the proposition that a statute should be construed and applied so as to give effect to the evident legislative intent, regardless of whether such construction varies from the statute's literal meaning. In Beebe et ux. v. Richardson, 156 Fla. 559, 23 So.2d 718, 719 (1945), this Court explained:
"... [W]here the context of a statute taken literally conflicts with a plain legislative intent clearly discernible, the context must yield to the legislative purpose, for otherwise the intent of the lawmakers would be defeated."
(Citations omitted.)
This ruling is echoed in State v. Webb, 398 So.2d 820, 824 (Fla. 1981):
It is a fundamental rule of statutory construction that legislative intent is the polestar by which the court must be guided, and this intent must be given effect even though it may contradict the strict letter of the statute.
In the instant case, the legislature's intent that UM coverage be stacked upon liability coverage, no matter what the UM limits, is not just "clearly discernible"; evidence of such intent is overwhelming. The final staff summary to the committee substitute for the house bill that was enacted as the 1984 amendment provided:
A. CURRENT LAW
Currently there are two forms of uninsured motorist coverage available to policyholders in Florida, the standard uninsured motorist coverage, and the new excess uninsured motorist coverage. The excess uninsured motorist coverage was first required to be made available in the 1982 rewrite of the Insurance Code. Under the standard uninsured motorist coverage, the amount of protection available to a policyholder is reduced by any liability insurance available to him from the other driver. The new excess uninsured motorist coverage provides that the full limit of uninsured motorist protection is available in addition to, and not reduced by, the other party's liability coverage.
For example, assume a motorist purchases uninsured motorist coverage with limits of $10,000... . He is involved in an accident with another motorist who has bodily injury liability insurance of $10,000... . Under these facts, no uninsured motorist coverage is available if the motorist has purchased the standard uninsured motorist protection. If the motorist elected to purchase the excess uninsured motorist coverage, assuming the damages are sufficient, the full $10,000 excess UM would be available, in addition to the $10,000 liability insurance available from the other driver.
... .
B. EFFECT OF CHANGES
The bill makes excess uninsured motorist coverage the only type of uninsured motorist coverage required to be offered by insurers.
Staff of Fla. H. Comm. on Commerce, CS for HB 319 (1984) Final Staff Summary 1-2 (June 21, 1984).
The staff analysis to the committee substitute for the comparable senate bill spelled out the effect just as clearly:

*398 A. Present Situation:
Current law provides that two types of uninsured motorist coverage must be made available to policyholders in Florida: standard uninsured motorist coverage and excess uninsured motorist coverage. The amount of coverage under the standard uninsured motorist coverage is reduced, or setoff, by the amount of liability insurance available to the policyholder from the other driver. The excess uninsured motorist coverage is in addition to (i.e., there is no setoff) the other driver's liability coverage. Thus, if a policyholder having standard uninsured motorist coverage of $10,000 . .. is involved in an accident with a person having bodily injury limits of [$10,000], the policy holder does not have any uninsured motorist protection available  the entire amount of his uninsured motorist coverage is offset by the other driver's BI coverage. If the policyholder has excess uninsured motorist coverage, the full [$10,000] would be available, regardless of the amount of liability coverage carried by the other driver.

... .
B. Effect of Proposed Changes:
This bill provides that the only type of uninsured motorist insurance would be excess underinsured motorist coverage.
Staff of Fla. S. Comm. on Commerce, CS for SB 243 (1984) Staff Analysis 1 (May 31, 1984) (emphasis added).
The examples contained in the house summary and senate analysis are directly contrary to the position urged by Shelby and accepted by the majority, and the senate analysis flatly states that UM coverage is stacked upon the tortfeasor's liability coverage "regardless of the amount of liability coverage carried by the [tortfeasor]." Accordingly, I would rule that under section 627.727, Florida Statutes (1985), UM coverage is stacked upon the tortfeasor's liability coverage no matter what the UM limits, provided that damages exceed the liability limits.[*] In my view, the majority opinion exalts form over substance to frustrate the legislative will.
I would approve the decision of the district court below and disapprove Woolard and Marquez.
KOGAN, J., concur.
NOTES
[1] While the issue is not before us, a reasonable argument could be made for the proposition that the same result would have occurred even under the 1982 amendment because except for the offset of liability coverage, excess insurance was designed to provide the same coverage as that required in subsection (1) and the definition of uninsured motor vehicle under subsection (3)(b) remained the same. The main benefit of the 1982 amendment which was carried forward into 1984 was the elimination of the offset of the tortfeasor's liability coverage.
[2] We note that the extent of UM coverage has been addressed once again in chapter 88-370, Laws of Florida.
[*] I recognize that this view would be inapplicable to section 627.727, as amended by chapter 88-370, section 15, Laws of Florida, which became effective October 1, 1989.